**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

BAKER COUNTY MEDICAL SERVICES,
INC.,

      **Plaintiff,**

-vs-              **Case No.  6:04-cv-1633-Orl-31DAB**

BROWN & BROWN, INC.,

      **Defendant.**

_____

# ORDER

In this case the Plaintiff, Baker County Medical Services, Inc. ("Baker") has sued the

Defendant, Brown & Brown, Inc. ("Brown"), under the Employee Retirement and Income Security

Act, 29 U.S.C. 1001, *et seq.* ("ERISA"), alleging that Brown breached its fiduciary duty as an

administrator of a benefits plan Baker established.  This matter is presently before the Court on

Brown's Motion for Summary Judgment (Doc. 22) and Baker's Response thereto (Doc. 31).  For

the reasons stated herein, Brown's Motion is denied.

**I.**   **Background**

  A. The Parties

  Baker is a non-profit corporation organized under the laws of the State of Florida.  Baker is

the named fiduciary of the Baker County Medical Services, Inc. Self-Funded Employee Welfare

Benefit Plan (the "Plan").[1]  Brown is a Florida corporation.

_____

  [1] Because the Plan is self-funded, the funds used to pay or reimburse covered medical
expenses, as well as the funds used to pay the costs associated with the Plan are paid in part from

B. Facts

*1) Agreements and relationships*

Baker established the Plan effective October 1, 2000. (Doc. 22, Ex. B at vii). Pursuant to the Plan's provisions, Baker agreed to pay or reimburse all or part of the covered medical expenses incurred by eligible employees and their eligible dependents. (Doc. 22, Ex. B). Effective October 1, 2000, Baker and Brown entered into an Administrative Services Agreement (the "Agreement"), pursuant to which Brown became the third party administrator for the Plan. (Doc. 22, Ex. A; Ex. C, Depo. of Berberich at 9). The terms of the Plan are incorporated into the Agreement by reference. (Doc. 22, Ex. A at 1). Pursuant to the Agreement, Brown acted as an agent for Baker in receiving and processing claims for benefits under the Plan, disbursing claim payments under the Plan, and performing additional duties as required by the Agreement. (*Id.*). Baker and Brown renewed the Agreement on an annual basis. (Doc. 1 at 2).

In administering claims for the Plan, Brown relied on several entities for assistance.[2] First, Brown relied on Intracorp to administer pre-certification review to determine whether a medical stay was both appropriate and consistent with the condition being treated.[3] (Doc. 22 at 3; Doc. 31, Att. 1 at 8 (Depo. of Macomber)). Plan participants and beneficiaries were responsible for

Baker's assets. (Doc. 1 at 2).

[2] It is customary in the claims industry to rely on outside entities for assistance with various tasks. (Doc. 22, Ex. C, Deposition of Steven Berberich, at 44). Although Baker claims a lack of knowledge that Brown was using entities such as Intracorp and Amerisys for review of issues such as pre-certification and network inclusion, (Doc. 31 at 4), this claim is highly suspect, particularly as to Intracorp, because the Plan itself provides that pre-certification review was to be conducted by Brown, and administered by Intracorp. (Doc. 22, Ex. B at 15).

[3] Intracorp was a subcontractor of Brown. (Doc. 31, Att. 1 at 19 (Depo. of Berberich at 7)).

obtaining pre-certification, and a participant's failure to have an entire hospitalization pre-certified resulted in a penalty equal to a fifty percent (50%) reduction in overall benefits for that hospitalization.  (Doc. 22 at 4; Ex. B at 15).  Second, Brown relied on Amerisys to perform limited medical reviews and to negotiate non-network discounts.  (Doc. 22 at 4; Doc. 31, Att. 1 at 20 (Depo. of Berberich at 8)).

Claims were normally processed within seven to ten days of receipt.  (Doc. 31, Att. 1 at 6 (Depo. of Macomber at 16)).  The Plan provides only that claims would be processed "promptly." (Doc. 22, Ex. B at 37).  The Agreement specifically provides for a performance standard claim turnaround time of "10 working days quarterly aggregate."  (Doc. 1, Ex. A at 6).  Pursuant to the terms of the Agreement, Claims would be turned around within ten days of receipt if they were complete, and most claims were handled within thirty days.  (Doc. 31, Ex. 1 at 21 (Depo. of Berberich at 10)).  A claim was considered "complete" if it had all of the parts necessary for processing.  (*Id*. at 11).  However, if additional information was needed, Brown would have to wait to receive that information, and the processing time would depend on how long it took for Brown to receive it.  (*Id*.).

Brown assisted Baker in obtaining reinsurance for the Plan by providing Baker with quotes from selected reinsurance carriers.  (Doc. 22 at 5).  Brown did not provide a guarantee of solvency for any reinsurance carrier, and Baker made the ultimate choice of a reinsurer based upon the financial impact of that decision to Baker.  (Doc. 22 at 5; Ex. D, Depo. of Macomber at 9).  Pursuant to Brown's recommendation, Baker accepted Legion Insurance Company ("Legion") as the reinsurer for the October 1, 2001 term, which ended on September 30, 2002.  (Doc. 1 at 2; Ex. B at 1).  Baker's reinsurance deductible was $30,000 per covered individual, so that when the

claims for a covered individual exceeded $30,000, Legion would reimburse Baker for payments over that deductible amount.  (Doc. 1, Ex. B at 2; *see also* Doc. 31, Att. 1 at 3 (Depo. of Macomber at 12)).

     *2) The claims in question*

This case involves Brown's handling of two benefits claims related to a covered individual, identified as "Florence E. H," (last name redacted) ("FEH").  (*See* Doc. 22, Ex. E at 1, 66; Ex. C at 11).  The first is a claim by Dr. Mark Spatola (the "Spatola Claim"), and the second is a claim by Orange Park Medical Center (the "OPMC Claim"), in the combined amount of $22,075.33.  (Doc. 22 at 4; Ex. C at ex. 3).

On October 24, 2001, FEH's provider made a request for pre-certification for a hospital stay for FEH.  (Doc. 22 at 6).  Intracorp pre-certified FEH's hospitalization from October 31, 2001 through November 5, 2001.  (*Id.*).  FEH was ultimately hospitalized, however, from October 29, 2001 through November 5, 2001.  (*Id.*).  Because Intracorp advised Brown that FEH's entire hospitalization was not pre-certified, Brown applied the Plan's fifty percent penalty for failure to pre-certify the entire hospitalization.  (*Id.* at 6-7).

On November 29, 2001, Brown noted the discrepancy in FEH's pre-certification dates and actual hospitalization dates, and confirmed with Intracorp that the pre-certification date it was using was correct.  (*Id.* at 7; Doc. 22, Ex. C at ex. 3; Ex. D at 34-35).

On November 13, 2001, the Spatola Claim was referred to a supervisor at Brown to determine whether that claim was subject to a discount.  (Doc. 22, Ex. C at ex. 3).  On November 14, 2001, the Spatola Claim was forwarded to Amerisys so that Amerisys could attempt to obtain a

discount on behalf of the Plan.[4]  (*Id*.).  Then, on December 11, 2001, Amerisys advised Brown that it could not obtain a discount, so Brown released the Spatola Claim on December 12, 2001 for payment on December 17, 2001.  (*Id*.).  In paying the Spatola Claim, Brown applied the fifty percent penalty because, according to Intracorp, that claim had not been pre-certified.[5]  (*Id*.).

Brown received the OPMC Claim on November 29, 2001.  (Doc. 22, Ex. C at ex. 3).  On December 10, 2001, Brown "pended" the OPMC Claim because additional information was needed to process the claim.  (*Id*.).  Brown received the information on January 11, 2002, and then processed and released the OPMC Claim, again applying the fifty percent penalty for the lack of pre-certification.  (*Id*.).

On March 19, 2001, Brown became concerned about the dates of Intracorp's pre-certification for FEH's hospitalization.  (*See* Doc. 31, At. 1 at 33 (Depo. of Berberich at 29) (noting that the inconsistency was brought to Brown's attention in March); *see also* Doc. 22, Ex. C at 12 and ex. 1 thereto).  Brown contacted Intracorp and requested that Intracorp investigate the discrepancy in the dates.  (Doc. 22 at 8).  Intracorp then contacted FEH's physician, verified the appropriate pre-certification dates, and then pre-certified FEH's entire hospitalization.[6]  (Doc. 22, Ex. C at 12-14 and ex. 3 thereto).  When Brown learned that FEH's entire hospitalization had been

[4] The issue of discount arose because Brown initially thought that the Spatola claim was a non-network, non-PPO claim.  (Doc. 22, Ex. C at 16).  However, it was later determined that Dr. Spatola was part of the relevant network and that no discount was available.  (Doc. 22, Ex. C at ex. 6).

[5] The penalty was applied to the Spatola Claim because it was related to FEH's hospital admission, and was therefore subject to the penalty for lack of pre-certification for hospital admission.  (Doc. 31, At. 1 at 36 (Depo. of Berberich at 32)).

[6] It appears that Intracorp initially used the wrong pre-certification dates.  (Doc. 22, Ex. C at ex. 3, 4 and 5).  Intracorp's reason for doing so is unclear.  (Doc. 22, Ex. C at 13-15, 45-46).

-5-

pre-certified, on March 25, 2002 Brown reversed the fifty percent penalty previously applied to the Spatola and OPMC Claims. (Doc. 22, Ex. C at ex. 3). This reversal resulted in additional payments of $17,693.25 to Orange Park Medical Center and $4,650 to Dr. Spatola. (*Id.*; *see also* Doc. 22 at 8). At that time, because FEH's claims had exceeded the deductible, these "re-administered" claims were submitted to Legion for reimbursement. (Doc. 31, Att. 1 at 33 (Depo. of Berberich at 29); Doc. 22, Ex. C at 21-22).

Around that time, Legion experienced severe financial difficulties. (Doc. 22 at 8). On March 15, 2002, Glen Epley, the former president of United Benefits, notified Baker that Legion's rating status had been downgraded from "excellent" to "fair." (Doc. 22, Ex. D at 25-26, 39 and ex. 13 thereto). Shortly thereafter, Legion suspended all reimbursements. (Doc. 22, Ex. D at 28). As a result, the Plan has not been reimbursed for the amounts by which the Spatola and OPMC Claims exceeded the $30,000 deductible.

On July 31, 2002, Brown, through its subsidiary, United Benefits, advised Baker that Brown had switched from Legion to ACE Insurance Company as the reinsurer as a result of Legion's insolvency.[7] (Doc. 22, Ex. D at ex. 7). After Legion was put into liquidation, Brown advised Baker on May 19, 2004 that Baker could still attempt to recoup unpaid reinsurance payments from Legion by filing a claim with Legion's liquidator. (Doc. 22, Ex. D at ex. 5).

Baker retained an investigator to examine the issues surrounding these claims. (Doc. 22 at 9, and Ex. G). This investigator determined that it was an error by Brown in the processing of these claims that caused the outstanding balance with Legion. (Doc. 22 at 10, and Ex. G). Thus,

---

[7] Legion was declared insolvent by the Pennsylvania Department of Insurance on July 28, 2003. (Doc. 1 at 4).

on July 7, 2004, Baker sent Brown a letter requesting payment in the amount of $25,524.13.  (Doc. 22, Ex. C at ex. 9).  After receiving that letter, Brown engaged in an internal investigation of Baker's allegations, and concluded that these claims were processed correctly based on the information initially received, were handled in a timely manner, and the reversals were handled in a timely manner upon the receipt of correct information.  (Doc. 22, Ex. C at ex. 10).

> C. Claim and Arguments

Baker claims that Brown breached its fiduciary duties by failing to timely process FEH's claim for reinsurance coverage, resulting in a loss to the Plan of $22,075.63.  More specifically, Baker's claim appears to be that Brown breached its fiduciary duty by attempting to obtain a discount on the Spatola claim which it should have known was not available and by incorrectly applying the pre-certification penalty to both claims which it knew or should have known did not apply and, in the process, delaying the processing of these claims.  The Plaintiff further claims that had these claims been handled properly the first time, full payment would have been made, thereby requiring payments in excess of the $30,000 reinsurance deductible, which would have required submission of the claim to Legion prior to the time that Legion stopped making reimbursements, thus resulting in Baker receiving full reimbursement from Legion.

In its Motion, Brown argues that, applying arbitrary and capricious review to Brown's actions, it cannot be said that Brown breached any fiduciary duty, and thus Baker cannot state a claim against it.

## II.    Standard of Review

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact.  FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d

454, 458 (11th Cir. 1994).  Which facts are material depends on the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgement points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted).  Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352.  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).[8]

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255.  The Court is not, however, required to accept all of the

---

[8] All decisions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent on courts within the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

nonmovant's factual characterizations and legal arguments.  *Beal*, 20 F.3d at 458-59.  If material

issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed

to trial.  *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).

**III.    Legal Analysis**

    A. Review of a Fiduciary's Actions

The disposition of this matter turns on the manner in which the Court is to review Brown's

actions.  Baker asserts, and Brown does not dispute, that Brown was a fiduciary with discretionary

authority.  (Doc. 1 at 6; Doc. 22 at 14).  The parties disagree, however, on the level of deference

the Court should apply to Brown's action, with Brown seeking review under the arbitrary and

capricious standard, and Baker arguing that *de novo* review should apply.

Baker brought this action pursuant to 29 U.S.C. section 1132(a), seeking a recovery under

29 U.S.C. section 1109 ("Section 1109").  (Doc. 1 at 5).[9]  Section 1109 ("Liability for breach of

fiduciary duty"), provides that:

> Any person who is a fiduciary with respect to a plan who breaches any of the
> responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter
> shall be personally liable to make good to such plan any losses to the plan resulting
> from each such breach . . . .

29 U.S.C. § 1109(a).  ERISA defines the standard of care for fiduciaries in 29 U.S.C. section 1104

("Section 1104"), as follows:

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of
> the participants and beneficiaries and –
>     (A) for the exclusive purpose of:

---

[9] Although Baker's Complaint is not specific, it appears that this action was brought under 29 U.S.C. section 1132(a)(2), which provides that an action may be brought by "a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title."  29 U.S.C. § 1132(a)(2).

> (i) providing benefits to participants and their
> beneficiaries; and
> (ii) defraying reasonable expenses of administering
> the plan;
> (B) with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting in a like
> capacity and familiar with such matters would use in the conduct of
> an enterprise of a like character and with like aims;
>
> . . .
>
> (D) in accordance with the documents and instruments governing the
> plan insofar as such documents and instruments are consistent with
> the provisions of this subchapter . . . .

29 U.S.C. § 1104(a)(1). In drafting this standard of fiduciary conduct, "Congress invoked the common law of trust and traditional trust principles to define the general scope of fiduciary authority and responsibility . . . ." *Prof'l Helicopter Pilots Ass'n v. Denison*, 804 F. Supp. 1447, 1452 (M.D. Ala. 1992). Thus, Sections 1104 and 1109 "require[] a fiduciary to comply with the prudence rule . . . ." *Simons v. Barnette*, 2003 WL 23336343 at *6 (M.D. Fla. Sept. 16, 2003). This prudence standard is an objective standard, judged on the basis of "a prudent fiduciary with experience dealing with a similar enterprise." *Id.*

Thus, instead of applying the arbitrary and capricious standard of review, the Court must examine Brown's actions under the statutorily-mandated "prudence" standard. *See GIW Indus., Inc. v. Trevor, Stewart, Burton & Jacobsen, Inc.*, 895 F.2d 729, 731 (11th Cir. 1990) (in action for breach of fiduciary duty under Sections 1104 and 1109, applying Section 1104 prudence standard to examine fiduciary's actions); *Simons*, 2003 WL 23336343 (M.D. Fla. Feb. 15, 2002) (claim of breach of fiduciary duty based on decline in plan assets examined under Section 1104 prudence standard); *Prof'l Helicopter Pilots*, 804 F. Supp. at 1452 (applying Section 1104 to breach of fiduciary duty claim arising out of alleged failure of plan fiduciaries to fund plan with employee

and employer contributions); *see also Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917-18 (8th Cir. 1994) (applying Section 1104 standard); *Ches v. Archer*, 827 F. Supp. 159, 165-66 (W.D.N.Y. 1993) (where plaintiffs claimed that fiduciaries breached duty by failing to collect and remit contributions to plan, Section 1104 prudence standard, not arbitrary and capricious standard, was controlling; "In evaluating fiduciaries' administration of ERISA plans, courts have typically applied the stricter, statutory standard of care, limiting the . . . arbitrary and capricious standard only to cases where the legality of the trustees' benefit determination was at issue."); *Kowalewski v. Detweiler*, 770 F. Supp. 290, 293 (D. Md. 1991) (where plaintiff alleged breaches of fiduciary duty under Section 1104, rejecting arbitrary and capricious standard, and finding that "[i]n cases involving plan administration or management of plan assets, [c]ourts have typically applied the more stringent statutory standards expressly contained in section 1104.").[10]

B. Brown's Actions in Question

Baker's primary allegation is that Brown breached its fiduciary duty by failing to timely process FEH's claims (the Spatola and OPMC Claims) for reinsurance coverage, and that because reinsurance did not reimburse Baker for these claims, Baker had to pay these claims in the amount of $22,075.63. (Doc. 1 at 7, 4). More specifically, Baker alleges that Brown was not acting in a

---

[10] *But see Engle v. Wal-Mart Assocs. Health & Welfare Plan*, 48 F. Supp. 2d 1114, 1118 (N.D. Ind. 1999) ("In § 1132(a)(3) cases, the arbitrary and capricious standard applies to decisions of a plan administrator cloaked with sufficient discretionary authority."); *Korchek v. Nichols-Homeshield*, 1997 WL 619869 (N.D. Ill. Sept. 30, 1997) (in action for breach of fiduciary duty, finding that "in determining the appropriate standard of review for a claim brought pursuant to §§ 1132(a)(2) or (3) for a claim speaking in breach of fiduciary duty, the court looks to principles of trust law . . . [and] according to the Second Restatement of Trusts, where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion.") (internal citations and quotation omitted).

prudent manner when it: (a) attempted to receive a discount on the OPMC Claim, and (b) relied on

mistaken information from Intracorp to apply the pre-certification penalty.  (Doc. 31 at 9-10).

Ultimately, Baker alleges that these imprudent acts caused a delay in the proper processing of

FEH's claims, a delay in the full payments of those claims, and a delay in the submission of these

claims to the reinsurer, resulting in the reinsurer not providing reimbursement on these claims

because it was suffering financial difficulties at the time it received these claims.  Finally, Baker

asserts that had these claims been properly processed in a timely manner, full reimbursement from

the reinsurer would have been obtained.

Drawing all inferences in favor of Baker, as the Court must at the summary judgment

stage, and applying Section 1104's prudence standard, summary judgment is precluded because a

number of questions of fact exist regarding the manner in which Brown processed FEH's claims.

These questions fall into a number of groups: first, when Brown actually became aware of the

proper (or correct) admission date, whether Brown's reliance on Intracorp was reasonable,[11] and

thus whether the manner in which Brown processed claims in applying the pre-certification penalty

was reasonable; second, whether Brown should have known that no discount was available for the

Spatola Claim, and thus whether the processing of this claim, including the submission for a

discount, was reasonable at the time; third, what the factual reason was for the delay in processing

these claims until March of 2002, and whether this delay in processing and submission to the

---

[11] Brown's relationship with Intracorp and Amerisys may also need to be precisely defined in order to determine what, if any, liability Brown may have incurred in its use of and reliance upon these entities.

reinsurer was reasonable; and finally, whether these various delays in fact caused the loss Baker sustained.

There is evidence that: Brown relied on Intracorp for pre-certification review; Intracorp initially applied incorrect dates to FEH's pre-certification; Dr. Spatola was part of the network and thus no discount was available; FEH's claims were not finally processed until March of 2002; and the Plan was not reimbursed for those claims because the reinsurer had stopped making reimbursements at that time.  There is also evidence that Brown acted in error and it was these processing errors that caused the loss to the Plan.  Given that the Court must apply a prudence test, which essentially tests the reasonableness of Brown's conduct, this evidence is sufficient to create questions of fact.

**VI.     Conclusion**

For the reasons stated herein, Brown's Motion for Summary Judgment (Doc. 22) is DENIED.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on August 24, 2005.

_____
GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

-13-